307 So.2d 283 (1975)
T. M. THURMAN, d/b/a Thurman Electric Company
v.
STAR ELECTRIC SUPPLY, INC., et al.
No. 54972.
Supreme Court of Louisiana.
January 20, 1975.
John D. Kopfler and Associates, J. R. Schmidt, Hammond, for applicant Stagecraft Industries, Inc.
Walton J. Barnes, Arthur J. Boudreaux, III, Barnes & Barnes; Baton Rouge, Tom
*284 H. Matheny, Pittman & Matheny, Hammond, for defendants-respondents.
MARCUS, Justice.
This matter originated as a concursus proceeding instituted by T. M. Thurman, doing business as Thurman Electric Company [hereinafter referred to as "Thurman"]. Cited to appear and assert their respective claims to monies deposited by Thurman in the registry of the court were Star Electric Supply, Inc. [hereinafter referred to as "Star"], Stagecraft Industries, Inc. [hereinafter referred to as "Stagecraft"], and Edwin F. Guth Company [hereinafter referred to as "Guth"]. Following trial, the district court rendered judgment in favor of Stagecraft, awarding it the sum deposited in the registry of the court, less court costs. Stagecraft was also given judgment against Star for the amount of the costs. Attorney's fees in the amount of $4,470.02 were also awarded to Thurman and were to be paid from the concursus funds. From this judgment, appeals were taken by Thurman, Stagecraft, and Star. The court of appeal reversed the awards to Thurman and Stagecraft and rendered judgment in favor of Star, awarding it the sum of the deposit, less court costs. Thurman v. Star Electric Supply, Inc., 294 So.2d 255 (La.App. 1st Cir. 1974). We granted the application of Stagecraft for review of the judgment of the court of appeal. 299 So.2d 351 (La. 1974).[1]

FACTS
The evidence discloses that Charles Carter & Company, Inc. [hereinafter referred to as "Carter"], entered into a general contract with the Louisiana State Board of Education, whereby Carter was to furnish all materials and perform all labor according to specifications in the construction of a multi-purpose classroom building to be located on the campus of Southeastern Louisiana College (now University) in Hammond, Louisiana. As required by the public contracts law, Carter obtained a surety bond (from the Aetna Casualty and Surety Company) guaranteeing the contractor's faithful performance of the contract and timely payment by him or any subcontractor for all work done, labor performed, and materials furnished. See La. R.S. 38:2241 (1950).
Shortly thereafter, Carter subcontracted the electrical work under the prime contract to Thurman, who obtained a bond from the Fidelity and Deposit Company of Maryland guaranteeing his faithful performance of the subcontract and his timely payment of all laborers and materialmen as required by law. Incidental to performance of his electrical subcontract, Thurman ordered certain materials from Star, a wholesale electrical supplier. In filling the order, Star purchased the items required from various manufacturers, including Stagecraft and Guth, for resale to Thurman. As is customarily done to save shipping costs, Star designated the job site as the place of delivery in its orders.
The controversy here centers around payment for certain electrical stage lighting equipment manufactured in separate component units and delivered to Thurman at the job site. Three lien affidavits, claiming that amounts were due and owing on the equipment, were filed. First, Star filed a sworn statement of claim on January 22, 1971 in the records of the clerk of court for Tangipahoa Parish, where the materials were delivered and incorporated into the construction project. In its affidavit, Star claimed that it was owed $46,277.75 for the materials supplied to Thurman.[2] A second lien affidavit was *285 filed in the Tangipahoa Parish records by Stagecraft on January 25, 1971, claiming that $44,894.00 was due for materials it furnished pursuant to orders from Star. Finally, Guth filed its affidavit of claim in the same parish records on February 25, 1971; it alleged that it was owed the sum of $12,053.05 for materials supplied to Thurman under orders from Star for use in the construction project.[3]
After the first two lien affidavits were filed, Thurman filed its petition for concursus on January 28, 1971. By various answers, reconventional demands, and third party demands, the cited parties asserted their claims to the depositied funds in the amounts stipulated in their lien affidavits. Whether the funds were properly distributed to Star by the court of appeal is the subject for resolution here.

ISSUES
In order to assess the correctness of the distribution of the funds by the court of appeal to Star and the merit of the competing claim of Stagecraft to the proceeds, two issues must be considered: (1) What parties are entitled to file a sworn statement of claim for amounts due for labor performed or materials furnished in the construction of public works? (2) Which of the parties is of the status described above?
If only Star is entitled to a claim under the public contracts law, the judgment of the court of appeal was correct in awarding it the fund deposited by Thurman. However, if, as contended by Stagecraft, it has a lien right under the public contracts law, it is entitled to the monies on deposit since its claim for payment of the price of the equipment necessarily antecedes that of Star, to whom it first sold the equipment for resale to Thurman, and payment to Stagecraft also satisfies the claim of Star to the extent that Star's claim represents its indebtedness to Stagecraft for the wholesale price of the equipment.

I.
The public contracts law dictates that the representative of any governing authority contracting for the construction of public works.
shall require of the contractor a bond, with good, solvent, and sufficient surety. . . for the faithful performance of the contract with an additional obligation for the payment by the contractor or subcontractor for all work done, labor performed, or material or supplies furnished for the construction . . . of any public works.
La.R.S. 38:2241 (1950). The law further provides that
[a]ny person to whom money is due for doing work, performing labor, or furnishing materials or supplies for the construction. . . of any public works. . .
may file a sworn statement of the amount due him with the governing authority having the work done and record it in the mortgage records of the parish in which the construction is located. Id. 38:2242. The effect of this is twofold: first, it accords to those not enjoying contractual privity with the general contractor a right of action against both the contractor and his surety; second, upon the filing and recordation of the affidavit of claim, any payment made by the governing authority without deducting the amount of the claim renders the authority liable for the claim. Id.
*286 The language quoted from the statutory provisions above has been interpreted in pari materia to embrace only those claimants for whose benefit a surety bond is required, i. e., those creditors seeking payment for labor performed for or materials furnished to the contractor or a subcontractor. See, e. g., American Creosote Works, Inc. v. City of Monroe, 175 La. 905, 144 So. 612 (1932); J. Watts Kearny & Sons v. Perry, 174 La. 411, 141 So. 13 (1932); 21 La.L.Rev. 846 n. 2 (1961). Hence, it is well settled in this state that a supplier of materials to another supplier of materials (in other words, a materialman of a materialman) is not entitled to the statutory benefits of the public contracts law, because the statute only embraces creditors of the contractor and subcontractors and not the creditors of materialmen.[4] Therefore, a claimant must demonstrate a contractual relationship with either the contractor or a subcontractor.
In this context, the definition of "subcontractor" becomes crucial in determining whether a supplier of materials is the creditor of another materialman (and hence not entitled to a lien) or a subcontractor (and protected by the embrace of the statute). The definition of "subcontractor" offered in Jesse F. Heard & Sons v. Southwest Steel Products, 124 So.2d 211 (La.App.2d Cir. 1960), cert. denied, Jan. 9, 1961 (unreported), is noteworthy in this respect. In determining whether the claimant in that case had supplied materials to another materialman or to a subcontractor, the court of appeal (quoting the opinion of the trial judge) determined that
. . . the test ought to be not whether or not there has been time and labor expended in producing the material, for that would be true in the preparation of all materials, but the test should be whether or not the person furnishing the material thereafter performed any labor in attaching to or incorporating the materials into the building or improvements involved in that case. Otherwise, it is evident that there would be no end to those who might do some labor away from the job site in the preparation of materials and because they had thus performed some labor would be able to file a claim or a lien against the project as provided for by law and the owner and the contractor would be subject to harassment by virtue of the claims of materialmen with whom they had not contracted and about whose claims they had no knowledge or information.
Id. 124 So.2d at 219-220.

II.
Applying this test to the instant controversy, it is clear that Star is not a subcontractor, as the evidence is undisputed that Star expended no labor in installing the materials that Thurman purchased from it into the construction project. Star was, therefore, a supplier of materials. Hence, as a supplier of materials to Star, Stagecraft is a materialman of a materialman; as such, it ordinarily would have no right of recovery against the subcontractor and his surety and would not be entitled to the concursus funds.
However, Stagecraft contends that, beyond its contractual relationship with Star, certain services rendered by its personnel in supervising the installation of the equipment it manufactured and delivered to the job site constitute labor performed for the subcontractor. It argues that a direct contractual relationship existed between Stagecraft and Thurman and that this entitled Stagecraft to a lien under the public contracts law and also establishes its superior right to the concursus fund.
A review of the evidence, however, discloses that Stagecraft was delegated no responsibility for installation of the equipment in question. As described in the testimony *287 of the manager of Stagecraft's lighting division, the job of Stagecraft was ". . . to see that the system [was] installed correctly by the contractor." The only labor performed by Stagecraft occurred when it hired and compensated two laborers from Thurman to correct circuitry within the equipment that was improperly wired at the time and site of manufacture. The corrective work required only six hours, and Stagecraft was responsible for the $166.00 in wages paid the two laborers. This service was a trade practice commonly performed by manufacturers of highly technical electronic equipment of this nature as part of the warranty against defects in their product; it in no way resulted from a delegation by Thurman of any of his responsibility for installation of all electrical equipment.
In sum, there is no evidence of a contractual relationship between Stagecraft and Thurman whereby Thurman, the subcontractor, in effect sub-subcontracted a portion of his responsibility for installation to Stagecraft, the manufacturer. Moreover, even if it were established that such a contract existed, this would only entitle Stagecraft to record its claim for amounts due for labor expended under its contract to install, not for the materials furnished by virtue of its contract of sale with Star.

CONCLUSION
In this controversy, Stagecraft occupies the position of a supplier of materials to Star, another supplier of materials. As such, Stagecraft is not entitled to a statutory lien. Moreover, there was no delegation by Thurman to Stagecraft of any of the former's responsibility for installation of electrical equipment as would establish a contractual relationship between Stagecraft and Thurman. In sum, there is no basis upon which it can be said that Stagecraft is owed amounts due for labor performed for or materials furnished to a contractor or subcontractor. Hence, it is not entitled to a claim against Thurman under the public contracts law, and the court of appeal was correct in awarding the fund to Star, who, as a wholesale electrical supplier, is a creditor of Thurman in the amount of the unpaid balance due on the purchase price of electrical materials sold by Star directly to the subcontractor.

DECREE
For the foregoing reasons, the judgment of the court of appeal is affirmed.
BARHAM, J., concurs.
NOTES
[1] Thurman's application to this court for review of the ruling denying him attorney's fees was denied. 299 So.2d 355 (La.1974). Thus, this ruling is final.
[2] In his petition for concursus, Thurman alleged the total amount due for the materials to be $44,702.28, which was the amount deposited in the registry of the court. The difference of $1,575.47 between the amount specified in the lien affidavit of Star and that reflected in the concursus petition filed by Thurman was the amount due for sales taxes. This was subsequently paid by Thurman and is not at issue.
[3] Guth neither appealed nor answered the appeal of Stagecraft and Star to the court of appeal. Thus, the judgment of the trial court denying its claim is final.
[4] E. g., Jesse F. Heard & Sons v. Southwest Steel Products, 124 So.2d 211 (La.App.2d Cir. 1960), cert. denied, Jan. 9, 1961 (unreported), noted in 21 La.L.Rev. 846 (1961).