926 So.2d 830 (2006)
Eddie T. SCOTT and Karen P. Scott, Plaintiff-Appellee,
v.
RED RIVER WATERWAY COMMISSION and The City of Bossier City, Defendants-Appellants.
No. 41,009-CA.
Court of Appeal of Louisiana, Second Circuit.
April 12, 2006.
*832 Lemle & Kelleher, L.L.P. by Robert W. Kyle, Leland G. Horton, Shreveport, James D. Hall, Bossier City, for The City of Bossier City.
Cook, Yancey, King & Galloway by Kenneth Mascagni, Shreveport, for The City of Bossier City and Nationwide Mutual Insurance Co.
Montgomery, Barnett, Brown, Read, Hammond & Mintz, L.L.P. by Gary J. Rouse, Ron Riggle, Jason A. Cavignac, J. Scott Loeb, New Orleans, for Continental Casualty Company.
Sam N. Gregorio, Shreveport, A.J. Gregory, Jr., for Eddie T. Scott & Karen P. Scott.
Preston and Covan, L.L.P. by Scott P. Yount, Randall C. Mulcahy, New Orleans, for Service Construction & Supply and Colony Insurance Company.
The Smitherman Law Firm, L.L.C. by Donald Lee Brice, Jr., W. James Hill, III, Shreveport, for Demopulos & Ferguson, Inc.
Henry H. LeBas, Barry J. Rozas, Mamou, for Zurich American Insurance Co.
Before BROWN, C.J., and CARAWAY and LOLLEY, JJ.
CARAWAY, J.
The City of Bossier City ("the City") filed a third party demand against the bonding company for a defaulted roadway contractor in a personal injury action filed against the City as the result of a vehicular accident occurring on the roadway. The City contended that in securing the roadway's completion after the default, the bonding company stepped into the shoes of *833 the original contractor and exposed itself to liability for defective conditions of the roadway. The trial court dismissed the bonding company from the suit on the exception of no cause of action. The City has appealed. We affirm.

Facts
On August 24, 2002, Jason David Scott was driving his truck south on the Arthur Ray Teague Parkway ("the Parkway") in Bossier City, Louisiana, when he failed to maneuver a curve in the roadway. Scott lost control of his vehicle and was propelled across the grassy median and two lanes of travel into a road sign owned by the Red River Waterway Commission. He died from the injuries received in the one-vehicle accident. The Parkway was designed and constructed as a City roadway and is maintained by the City. Scott's parents sued the City and the Red River Waterway Commission seeking damages for the wrongful death of their son from defects in both the road sign and the Parkway.[1]
The City filed a third party demand against Continental Casualty Insurance Company ("Continental"), the performance bond company for the original contractor, Plaquemines Contracting Inc. ("Plaquemines"). Plaquemines had defaulted in its work on the initial construction contract for the Parkway. The City alleged that Continental's agreement to complete the project exposed it to potential liability for any defective conditions of the Parkway. On September 22, 1999, Continental entered into a "Completion Agreement" with the City and tendered a joint venture, CW & W Contractors, Inc. and J.A. Long, Inc. ("the Joint Venture"), as the completion contractor.[2] The City agreed to work directly with the Joint Venture which provided its own performance and payment bonds.
Additionally, Continental and the Joint Venture entered into a "Completion Construction Contract," dated December 28, 1999. That contract provided that the Joint Venture, as the "Completion Contractor," "shall be bound in the same manner and to the same extent that the surety [Continental] . . . would be bound to the Owner [the City] had the Completion Contractor been the Former Contractor under the Original Contract, including but not limited to the conditions or determinations by the Owner with respect to all work performed by the Completion Contractor." Although the City was not a signatory party to the agreement, the contract further stated that the "Owner has agreed to treat Completion Contractor just as if Completion contractor were the former contractor and such former contractor had not defaulted." Eventually, upon the conclusion of the Parkway project on May 10, 2000, the City executed a "Certificate of Substantial Completion" which acknowledged that the work on the December 28, 1999 Completion Construction Contract had been substantially performed by the Joint Venture as contracted.
Continental filed peremptory exceptions of no cause of action and peremption on the grounds that it had performed solely in accordance with the bonding agreement it *834 had with Plaquemines for the benefit of the City and not as a contractor. The City contended that by assuming the responsibility for completing the Parkway after Plaquemines' default, Continental took over the role of general contractor and subjected itself to liability to injured third parties for any defective condition in the Parkway independent of any bond claims.
The trial court sustained Continental's exceptions and dismissed it from the suit on the grounds that the contract agreements showed that the Joint Venture, and not Continental, was the general contractor for the completion of the Parkway project. This appeal by the City ensued.

Discussion
A peremptory exception of no cause of action is used by the defendant to test the legal sufficiency of the petition by determining whether the law affords a remedy to the plaintiff on the facts that are alleged in the petition. Mack v. Evans, 35,364 (La.App.2d Cir.12/5/01), 804 So.2d 730, writ denied, 02-0422 (La.4/19/02), 813 So.2d 1088. In determining whether a plaintiff has stated a cause of action, the court looks to the facts set out in the petition, accepting them as true without regard to extrinsic evidence. Id. The purpose of the exception is only to determine if a cause of action is pled and not whether the plaintiff will ultimately prevail at trial. When it can reasonably do so, the court should maintain a petition against a peremptory exception so as to afford the litigant an opportunity to present his evidence. Id. An appellate court reviews a trial court's ruling on an exception of no cause of action de novo because the exception raises a question of law and the lower court's decision is based only on the sufficiency of the petition. City of New Orleans v. Board of Directors of Louisiana State Museum, 98-1170 (La.3/2/99), 739 So.2d 748.
Ordinarily, the meaning and intent of the parties to a written instrument should be determined within the four corners of the document, and its terms cannot be explained or contradicted by extrinsic evidence. Brown v. Drillers, Inc., 93-1019 (La.1/14/94), 630 So.2d 741. When a contract may be construed from the four corners of the instrument, that interpretation is a matter of law for the court to determine. NAB Natural Resources, L.L.C. v. Willamette Industries, Inc., 28,555 (La. App.2d Cir.8/21/96), 679 So.2d 477.
A contracting party may stipulate a benefit for a third person, who is called a third party beneficiary. Once the third party has manifested his intention to avail himself of the benefit, the parties may not dissolve the contract by mutual consent without the beneficiary's agreement. La. C.C. art. 1978. The law does not require express acceptance or consent by the third party beneficiary or a particular form of acceptance or consent. Cooper v. Louisiana Department of Public Works, 03-1074 (La.App. 3d Cir.3/3/04), 870 So.2d 315, writ not considered, 04-1431 (La.9/24/04), 882 So.2d 1146. The stipulation gives the third party beneficiary the right to demand performance from the promisor. La. C.C. art. 1981.
The Louisiana Public Works Act, La. R.S. 38:2181, et seq., provides a detailed procedure in the letting of public contracts. La. R.S. 38:2216(A)(1) requires that:
. . . a written contract shall be entered into by the successful bidder and the public entity letting the contract, and the party to whom the contract is awarded shall furnish good and solvent bond in an amount not less than one-half of the amount of the contract, for the faithful performance of his duties.
Additionally, in pertinent part, La. R.S. 38:2241 provides:

*835 * * *
A. (2) For each contract in excess of twenty-five thousand dollars per project, the public entity shall require of the contractor a bond with good, solvent, and sufficient surety in a sum of not less than fifty percent of the contract price for the payment by the contractor or subcontractor to claimants as defined in R.S. 38:2242. The bond furnished shall be a statutory bond and no modification, omissions, additions in or to the terms of the contract, in the plans or specifications, or in the manner and mode of payment shall in any manner diminish, enlarge, or otherwise modify the obligations of the bond. The bond shall be executed by the contractor with surety or sureties approved by the public entity and shall be recorded with the contract in the office of the recorder of mortgages in the parish where the work is to be done not later than thirty days after the work has begun.
* * *
C. The payment provisions of all bonds furnished for public work contracts described in this Part, regardless of form or content, shall be construed as and deemed statutory bond provisions. Any such bond which fails to contain any of the requirements set forth in this Part shall be deemed to incorporate all of the requirements set forth in this Section. Language in any such bond containing any obligations beyond the requirements set forth in this Part shall be deemed surplusage and read out of such bond. Sureties and contractors executing payment bonds for public works contracts under this Part shall be immune from liability for or payment of any claims not required by this Part.
D. A bond issued pursuant to this Section shall not create, nor shall such bond be construed to create, any cause of action in favor of the public entity, or any third party, for personal injury or property damages sustained by any third party during the effective period of the bond. . . .
E. Any provisions of a bond issued pursuant to this Section which are contrary to Subsection D hereof are hereby declared to be contrary to the public policy of the state of Louisiana and are null and void.

* * *
This section requiring a bond in connection with the construction of public works provides protection to the public authority from loss and expense arising out of the failure of the contractor to faithfully perform the contract. Avallone Architectural Specialities, L.L.C. v. DBCS Corp., 36,971 (La.App.2d Cir.3/5/03), 839 So.2d 1045. The bond also may serve to insure against unpaid claims from parties supplying labor and materials for the construction of the public works who assert such claims under the Act. La. R.S. 38:2242; Wilkin v. Dev Con Builders, Inc., 561 So.2d 66 (La.1990). The Public Works Act refers to the bonding company as a surety. Therefore, with the issuance of the bond, the bonding company has bound itself to pay up to the amount of the bond in the event of nonfulfillment or nonperformance of the contractor's obligations for the public works contract.
Continental presented its exceptions in this case with evidence of three contractual acts of the parties, the Completion Agreement, the Completion Construction Contract, and a "Certificate of Substantial Completion." There was no objection to the trial court's consideration of this evidence for the exception of no cause of action as each of the three contractual acts were referenced and discussed *836 in the City's third party demand against Continental. Although generally, parties may not introduce evidence to support or controvert the exception of no cause of action, the jurisprudence recognizes an exception to this rule that allows the court to consider evidence admitted without an objection to enlarge the pleadings. City of New Orleans v. Board of Directors of Louisiana State Museum, supra.
On appeal, the City reiterates its arguments made in opposition to the exceptions, namely, that Continental assumed responsibility and liability for constructing the Parkway, including liability for any failure to properly complete the Parkway. Specifically, the City grounds its argument on language contained in Article I of the Completion Agreement. In relevant part, that provision reads as follows:
SURETY agrees to arrange for the performance and completion of the work remaining under the Contract and accepts responsibility for the performance of the work remaining to be completed under the Contract. The terms and conditions of the bond, the Contract, and all Contract documents included, by reference therein, with any amendments or modifications as of the date of this agreement shall govern the rights and liabilities of the parties except as set forth hereinafter.
SURETY at this time tenders CW & W Contractors, Inc./J.A. Long, Inc., a Joint Venture (hereinafter "Completion Contractor") as the contractor who shall undertake the completion of the project. OWNER does not object to this tender and accepts the Completion Contractor. OWNER agrees that it will work directly with Completion Contractor as if Completion Contractor was the original contractor. . . .
The City argues that Continental's agreement to accept responsibility for the performance of the work remaining to be completed under the contract created a new contract for construction of the Parkway and evidences the intent of the parties that Continental would bear full responsibility and accountability for the work as general contractor.
The City argues that Continental effectively undertook the completion of the project and, in accordance with the case of Klein v. J.D. & J.M. Collins, 159 La. 704, 106 So. 120 (1925), stepped into the shoes of the original contractor. In Klein, the court concluded that the surety stepped into the shoes of the contractor when the surety took an active role in the completion of the project, such as giving direct orders for materials used to complete the building. Additionally, payments by the owner for additional work on the uncompleted project were agreed to be paid directly to the surety. The case did not involve a third party personal injury action, but rather the additional costs of completing the structure and delay damages due the owner of the building.
The details of the original bond contract in this case are not set forth in the City's petition. Nevertheless, that contract, which was between Plaquemines and Continental, established a legal suretyship in the City's favor governed under the Public Works Act as explained by the foregoing jurisprudence. The Act, however, does not specifically detail how the surety may act to remedy a contractor's default in a given situation. If, for example, after completion of the project, an unpaid claimant files a claim against the contractor in the mortgage records pursuant to Section 2242(B) of the Act, the surety may be required only to pay money in the event of the contractor's default in paying that claim. On the other hand, the default by *837 the contractor in this case was an event of nonperformance which left the work on the project uncompleted, and Continental was called on to remedy that nonperformance.
Clearly, if the bond surety pays off its accessory obligation in money and acts in no other manner concerning the project, the language of Section 2241(C) and (D) of the Act indicates that its liability is limited to the amount paid and that any cause of action by a third party for personal injury arising from defects in the project would not extend to the surety. This conclusion is also supported by our general tort law. A bond surety is not the owner of the project and cannot be expected to perform in the project's actual construction which gives rise to a defective condition. Therefore, fault under Civil Code Articles 2317.1 or 2315 would not arise as the result of an insuring, financial role of the surety.
Nevertheless, the Klein case demonstrates that instead of a bond surety merely paying off an amount under its bond upon the contractor's default, it may contract with the owner to provide for a project's completion in some other manner. If the surety by that contract takes on the role of the contractor and acts directly in completing the project, its liability can extend beyond the amount of its bond. The contract at issue in this case is of course a different undertaking from that which the surety agreed to in Klein and must be examined on its own facts. Our examination of the three agreements identified above convinces us that Continental did not take actions pursuant to the agreements which materially changed its role as surety in this case.
The City argues that it never contracted directly with the Joint Venture and that the Joint Venture became Continental's subcontractor after Continental assumed the role as general contractor. While it is true that the City was not a signatory party with the Joint Venture on any one of the three agreements, the course of dealings by the City and Joint Venture pursuant to those agreements demonstrates that a contractual relationship existed.
As quoted above, by executing the Completion Agreement, the City agreed "that it will work directly with [Joint Venture] as if [Joint Venture] was the original contractor." Reciprocally, the Joint Venture agreed in the Completion Construction Contract with Continental that the Joint Venture would be bound to the City as though the Joint Venture had "been the Former Contractor under the Original Contact." Significantly, as to the payments for the remainder of the work on the project, the Completion Construction Contract states that "[c]ompensation to the [Joint Venture] shall be comprised of a lump sum payment from the Surety and periodic payments from Owner as per the Original Contract at the original unit prices." The contract then identifies the "lump sum" owed by Continental as $992,515.19, which was the amount needed to compensate for the default of the prior contractor, and the amount of $2,969,960.05 to be paid by the City directly to the Joint Venture as the remaining periodic contract payments under the original contract for the Parkway. The Joint Venture was to insure this total amount of $3,962,475.29 with a new performance bond under the Public Works Act, thereby providing the City with additional suretyship protection for performance by the Joint Venture, not Continental.
The City's petition suggests that this course of conduct set forth in the parties' agreements was carried out, as indeed, the Parkway was completed. The City not only availed itself of the benefits stipulated in its favor under the Completion *838 Construction Contract, it directly paid the Joint Venture which was a stipulated performance owed by the City for those benefits. The final "Certificate of Substantial Completion" is a contract document that expressly identifies as the subject matter the December 28, 1999 Completion Construction Contract. This is the very contract for which the City denies responsibility and privity. The occurrence of "substantial completion" was acknowledged by the City's engineer who signed the Certificate. While the Certificate did provide a place for the Joint Venture to sign and to agree to the remaining "Punch List" of items to complete the job, a signature for the Joint Venture is not shown on the copy of the Certificate filed in evidence. Nevertheless, there is no allegation that the completion of the work identified by the Certificate was not carried out through the course of dealings between the City and the Joint Venture as recognized therein. The Certificate therefore represents a contractual agreement between the City and the Joint Venture addressing the conclusion of their overall contractual relationship for the project.
Regarding Continental's role, there are no allegations in the City's third party petition that Continental performed any act of construction, directed the Joint Venture's construction work decisions, or caused an alteration of the original design and specifications for the project as a result of its contractual initiatives. It performed a portion of its $9 million insuring/suretyship obligation by paying out $992,515.19 to place the construction project back on track. Under these circumstances, we find that Continental did not perform beyond its role as surety and assume additional performance duties on the project which would give rise to the legal responsibility for the alleged defective premises that caused the death of plaintiffs' decedent.
Accordingly, the trial court judgment sustaining Continental's exception of no cause of action is affirmed. Costs of this appeal are assessed against the City in accordance with the provisions of La. R.S. 13:5112 in the amount of $119.00.
AFFIRMED.
NOTES
[1] The Red River Waterway Commission filed a third party demand against Coyle Engineering Company, Inc. and Service Construction and Supply Company, Inc. and its insurer, Colony Insurance Company, alleging the negligence of these defendants in the design, construction and placement of the sign. Service Construction and Supply Company, Inc. and Colony Insurance Company were denied summary judgment dismissing them from the suit.
[2] The City also filed third party demands against the Joint Venture and Demopulos and Ferguson, Inc., the design engineering firm for the Parkway.