803 So.2d 992 (2001)
JEAN SIMPSON PERSONNEL SERVICES, Plaintiff-Appellee,
v.
G & G CONCRETE, LLC, Don M. Barron Contractor, Inc., Great American Insurance Company and Webster Parish School Board, Defendants-Appellants.
No. 35,497-CA.
Court of Appeal of Louisiana, Second Circuit.
December 5, 2001.
Rehearing Denied January 17, 2002.
*993 Daniel, Coker, Horton and Bell by Richard C. Bradley, III, Jackson, MS, Ron S. Barron, Ruston, Counsel for Appellants.
Walter D. White, Shreveport, Counsel for Appellee.
Becky Greer, In Proper Person, Agent for G & G Concrete.
Before CARAWAY, PEATROSS and KOSTELKA, JJ.
KOSTELKA, J.
Don M. Barron Contractor, Inc., Great American Insurance Company and the Webster Parish School Board (collectively, "Appellants") appeal the trial court's grant of summary judgment in favor of Jean Simpson Personnel Services, Inc. in connection with its claim under the Louisiana Public Works Act. For the following reasons, we reverse the judgment of the trial court and render judgment in favor of Appellants.

FACTS
Don M. Barron Contractor, Inc. ("Barron"), Great American Insurance Company ("Great American") and the Webster Parish School Board (the "School Board") were named defendants by Jean Simpson Personnel Services, Inc. ("Jean Simpson") in this matter which arises from a contract between Barron and the School Board dated March 8, 1999 for the construction of a new junior and senior high school in Sibley, Louisiana (the "Project"). Pursuant to the Louisiana Public Works Act, La. R.S. 38:2241, et seq. (the "Act"), Barron obtained a payment bond from Great American.
In May, 1999, Barron subcontracted to G & G Concrete Contractors, LLC ("G & G Concrete") certain foundation work on the Project.[1] In June, 1999, G & G Concrete began work on the Project and began receiving payments from Barron for work completed. During the months of June, July and August of 1999, G & G Concrete continued to work on the Project and requested and received various payments from Barron for work completed. G & G Concrete did not perform further work on the Project after receiving and cashing a check from Barron on August 11, 1999.
In early July, 1999 (more than a month after G & G Concrete had begun work on the Project), it entered into an agreement with Jean Simpson, wherein Jean Simpson agreed to perform payroll services and advance credit to G & G Concrete. In accordance with their agreement, Jean Simpson advanced funds for the payroll amounts paid to the employees in addition to the various state and federal employment taxes and workers' compensation premiums paid to the respective entities. Additionally, Jean Simpson required that all employees submit to drug testing, and it invoiced G & G Concrete a fee for each person tested. There was no written agreement regarding the services that Jean Simpson would actually provide to G & G Concrete. G & G Concrete was provided with a written document entitled "Conditions of Service" which contained certain prohibitions on "Jean Simpson Personnel Services, Inc. employee(s)" regarding the operation of machinery, vehicles and handling of cash, negotiables or other valuables; however, this document did not describe the actual services provided by Jean Simpson to G & G Concrete or the nature of their relationship, and it was not signed by any representative of either *994 company. Additionally, G & G Concrete completed a Credit Application and Guaranty, which was signed by Becky Greer, in her capacity as president of G & G Concrete as well as individually. In so doing, Becky Greer gave her personal guarantee securing the indebtedness of G & G Concrete.
Jean Simpson began advancing credit and providing payroll and administrative services to G & G Concrete during the week ending July 11, 1999 and continued to do so until mid-August, 1999. It appears that Barron did not have knowledge of any relationship between G & G Concrete and Jean Simpson and specifically did not have knowledge that G & G Concrete was indebted to Jean Simpson.
Over the period of time stated, Jean Simpson extended credit to G & G Concrete in the amount of $88,634.20. Jean Simpson states that pursuant to the agreement between it and G & G Concrete, its invoices required payment on receipt. When G & G Concrete failed to make payment, collection efforts by Jean Simpson commenced on August 2, 1999. Although the early invoices were not paid by G & G Concrete, Jean Simpson continued to make normal payroll obligations to the employees as well as other employee overhead. Finally, on August 13, 1999, a representative of Jean Simpson informed the G & G Concrete Project superintendent that Jean Simpson would no longer pay the employees. On that same date, G & G Concrete stopped work on the Project, and Barron was forced to complete that portion of the work that G & G Concrete had failed to perform.
Ultimately, on November 23, 1999, Jean Simpson filed a Materialman's Lien in the amount of $88,634.20 in the Webster Parish public records. Subsequently, on March 9, 2000, Jean Simpson filed its Petition to Enforce Materialman's Privilege, for Judgment Upon Open Account and Attorney Fees against the Appellants and G & G Concrete. Barron and Great American filed their motion for summary judgment, as did Jean Simpson. After oral argument on the counter-motions, the trial court ruled, from the bench, in favor of Jean Simpson, granting its motion and denying the motion of Barron and Great American. In granting summary judgment in favor of Jean Simpson, the trial court simply stated that Jean Simpson "should be entitled to recover. I think that they did perform work or labor for this particular job, this specific job, ..." Judgment was entered on May 2, 2001 in favor of Jean Simpson in the amount of $88,634.20 plus costs, interest from the date of judicial demand and 10 percent attorney fees. This appeal by Appellants ensued.

DISCUSSION
The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of any action. The procedure is favored and shall be construed to accomplish those ends. La. C.C.P. art. 966(A)(2). A motion that shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted. La. C.C.P. art. 966(C)(1). Summary judgment is appropriate when all the relevant facts are marshaled before the court, the marshaled facts are undisputed, and the only issue is the ultimate conclusion to be drawn from those facts. Robertson v. State ex rel. Department of Planning and Control, 32,309 (La.App.2d Cir.12/10/99), 747 So.2d 1276, writ denied, XXXX-XXXX (La.02/25/00), 755 So.2d 882, citing, Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La.07/05/94), 639 So.2d 730, 752.
*995 Appellate review of the grant of summary judgment is de novo, utilizing the same criteria as the trial court. Dumas v. Angus Chemical Co., 31,969 (La. App.2d Cir.08/20/99), 742 So.2d 655, writ not considered, 99-2750 (La.11/05/99), 751 So.2d 237. Such review allows an appellate court to also consider the denial of an opposing motion for summary judgment that is based solely upon the resolution of a legal question, which is the case at hand. See, Magill v. Owen Const. Co., Inc., 434 So.2d 520 (La.App. 2d Cir.1983).
In their first assignment of error, Appellants argue that the trial court erred in granting Jean Simpson's motion for summary judgment by including Jean Simpson in the definition of a claimant as contained in the Act. Specifically, Appellants argue that Jean Simpson cannot be a claimant because it did not itself (1) subcontract to do any work or perform labor on the Project or (2) supervise or direct the employees on the Project. For the following reasons, we agree.
Primarily, we note that because the Act is in derogation of common rights, it is stricti juris and liability of a surety may not be expanded beyond the Act. U.S. Pollution Control, Inc. v. National American Ins. Co., 95,153 (La.App. 3d Cir.08/30/95), 663 So.2d 119. In addition, the terms of a surety's bond are to be construed within the strict boundaries of the Act. La. R.S. 38:2241(C).
The definition of "claimant" is set forth in La. R.S. 38:2242(A)(1), which states, in pertinent part, as follows:
"Claimant", (sic) as used in this Chapter, means any person to whom money is due pursuant to a contract with the owner or a contractor or subcontractor for doing work, performing labor, or furnishing materials or supplies for the construction, alteration, or repair of any public works, or for transporting and delivering such materials or supplies to the site of the job by a for-hire carrier, or for furnishing oil, gas, electricity, or other materials or supplies for use in machines used in the construction, alteration, or repair of any public works, including persons to whom money is due for the lease or rental of movable property, used at the site of the immovable and leased to the owner by written contract, ...
Under the clear language of the Act, Jean Simpson may qualify as a claimant if it was a party to a contract with G & G Concrete "for doing work, performing labor, or furnishing materials or supplies for the construction... of [the Project]...." The other elements of the statute are clearly unsuited to the facts at hand and are, thus, inapplicable. Therefore, a determination must be made as to whether Jean Simpson was doing work, performing labor or furnishing materials or supplies for the construction of the Project. The parties agree that no issue of material fact exists.
Initially, an examination of the nature of Jean Simpson's business and its relationship with G & G Concrete must be conducted to determine whether Jean Simpson meets the requirements of a claimant entitled to lien rights under the Act. Such an examination of the facts clearly reveals that Jean Simpson does not fit such a mold.
The nature of Jean Simpson's business was unequivocally set forth by the company itself. In response to discovery propounded by Barron and Great American, Jean Simpson described itself as a "`personnel service,'" which "provided only payroll services as directed by [G & G Concrete]...." (Emphasis added). Additionally, in those same discovery responses, Jean Simpson described itself as "a vendor of [G & G Concrete] who provided *996 labor services on the job site as directed by [G & G Concrete]."[2] (Emphasis added).
The scope of the relationship between Jean Simpson and G & G Concrete was equally clearJean Simpson agreed to pay G & G Concrete's laborers, along with G & G Concrete's additional labor obligations, extending credit for sums advanced pursuant to the written credit agreement. Jean Simpson did not supply the laborers to G & G Concrete. There is no question that the laborers on the Project were originally G & G Concrete employees and considered such even by Jean Simpson, as it stated that "[G & G Concrete] had previously identified the employees and the rates of pay, and the duties and responsibilities.... As a result of their request [G & G Concrete] sent the employees to [Jean Simpson] to complete applications and various payroll forms...." Sandra Braddock ("Braddock"), president and general manager for Jean Simpson, described the "payroll services" provided by Jean Simpson as follows:
A company will have an employee that they wish to work but they do not want to be the employer, so they send the person to us. That person fills out all the paperwork, the application, everything, they become our employee, and we contract them back to the company....
The deposition testimony of Braddock further indicates that the laborers were originally G & G Concrete people and did not simply belong to some pool of temporary laborers that Jean Simpson maintained and leased out to various contractors. Braddock described the laborers as "their people," referring to G & G Concrete. And, when asked if Jean Simpson provided any employees for G & G Concrete that were not already employed by G & G Concrete, Braddock responded:
I believe we had two or three here. I see on [G & G Concrete Customer Order/Assignment Order Form dated July 21, 1999], `Need three from us, unless he finds more, to payroll on the [Project].' But I can't tell you which ones on this assignment we actually found for him or he sent in for us to payroll.
The business notes of Jean Simpson kept in connection with the G & G Concrete account also make evident that the laborers were considered G & G Concrete's employees from the start. The following entries were made:
July 9, 1999: I called and talked to [a G & G Concrete representative], explained that [David Greer, an owner of G & G Concrete] had said he wanted us to pay their people for this week....
I talked to David [Greer], he will have his other men here Tues AM to fill out their [application] and drug screen. He is a really friendly guy, said if we ever needed to use one of his finishers for a couple day [sic] job he would try to work it out. Said we are helping him and he wants to help us. (Emphasis added).
Moreover, Jean Simpson repeatedly denied having any supervisory control over the employees on the Project. It admitted in its discovery responses that "[G & G Concrete] directed the hours, place of work, duties and supervision of all the employees...." and further responded that:

*997 [It] was not responsible for the supervision of (sic) direction of employees on the job site. That responsibility was the sole responsibility of [G & G Concrete] who to the knowledge of [Jean Simpson] did possess appropriate licenses and who did have the responsibility for labor completion on the project of contracted services.
Neither can Jean Simpson be considered a subcontractor, entitled to lien rights by virtue of that status. We look to Jesse F. Heard & Sons v. Southwest Steel Products, 124 So.2d 211 (La.App. 2d Cir.1960), for guidance on that point, wherein this court previously stated:
[T]he test ought to be not whether or not there has been time and labor expended in producing the material, for that would be true in the preparation of all materials, but the test should be whether or not the person furnishing the material thereafter performed any labor in attaching to or incorporating the materials into the building or improvements involved in that case. Otherwise, it is evident that there would be no end to those who might do some labor away from the job site in the preparation of materials and because they had thus performed some labor would be able to file a claim or a lien against the project as provided for by law and the owner and the contractor would be subject to harassment by virtue of the claims of materialmen with whom they had not contracted and about whose claims they had no knowledge or information.
Id. at 219-220; see also, Thurman v. Star Elec. Supply, Inc., 307 So.2d 283 (La. 1975). In Jesse F. Heard & Sons, this court looked to the nature of a party's contractual obligation to determine if it was a subcontractor or simply a supplier of materials, stating "[T]here is a palpable distinction between a contract to erect or in being a sub-contractor and a contract to furnish toward the erection...." Id. at 220.
Here, Jean Simpson was not supplying materials, nor was it, as discussed herein, actually supplying the labor. Notably, the lien filed by Jean Simpson was a materialman's lien. The entity of Jean Simpson performed no labor or work on the Project. It was merely supplying a service to G & G Concrete that enabled it to conduct the work that G & G Concrete had contracted with Barron to do. The agreement between Jean Simpson and G & G Concrete clearly was not related to the actual construction of the Project by Barron, G & G Concrete or the other subcontractors on the job. The law in Louisiana is well-settled that a materialman who furnishes material to a materialman has no right to a lien. Id. at 220. It follows, by analogy, that one who simply provides employment services, such as Jean Simpson, but is otherwise uninvolved in the construction of the public project, likewise should not be entitled to the lien rights of a claimant under the Act.
Jean Simpson was not a business which performed any sort of services which directly furthered the construction of the Project. True, it paid the laborers in question, but we cannot determine that such an act alone would make those laborers necessarily the employees of Jean Simpson. Other than that purely administrative task, Jean Simpson had no supervision or control over the work done or labor performed by the laborers. Nor is Jean Simpson subrogated to any rights of the laborers. See, Pringle-Associated Mortg. Corp. v. Eanes, 254 La. 705, 226 So.2d 502 (1969). Moreover, these laborers were not in Jean Simpson's employ before G & G Concrete contacted Jean Simpson, nor is there any indication that they remained in Jean Simpson's employ. Clearly, Jean *998 Simpson's contract with G & G Concrete was not one to do work, perform labor or furnish materials or supplies for the construction of the Project. Notably, the only written agreement between the parties was the Credit Application and Guaranty executed by Becky Greer, which simply set forth the terms of the credit being extended to G & G Concrete for the services provided by Jean Simpson. Thus, under a strict interpretation of the Act, it was an error of law for the trial court to determine that Jean Simpson was a claimant entitled to lien rights.
Appellants also raise two other assignments of error regarding the amount of the judgment granted Jean Simpson, as well as the propriety of the statutory attorney fees granted. Any discussion of such is pretermitted by our decision herein, and we need not address the merits of Appellants' arguments as to whether the trial court erred or not on those issues.
Finally, Appellants claim attorney fees under La. R.S. 38:2246(B), which states:
If the trial court finds that such an action was brought by any claimant without just cause or in bad faith, the trial judge shall award the principal or surety a reasonable amount as attorney's fees for defending such action.
This matter dealt with a detailed question of law, and for that reason cannot be considered as being brought without just cause or in bad faith. Therefore, we deny Appellants' request for attorney fees.

CONCLUSION
For the foregoing reasons, the judgment of the trial court granting Jean Simpson's motion for summary judgment is hereby reversed, and we render judgment in favor of Appellants, granting their motion for summary judgment dismissing the claims of Jean Simpson. Costs of this appeal are assessed to Jean Simpson.
REVERSED AND RENDERED.

APPLICATION FOR REHEARING
Before NORRIS, C.J., WILLIAMS, CARAWAY, PEATROSS, and KOSTELKA, JJ.
Rehearing denied.
NOTES
[1] G & G Concrete was also a named defendant in the litigation; however, it did not defend the suit against it, and a default judgment was obtained against it by Jean Simpson. G & G Concrete is not a party to this appeal.
[2] The providing of payroll services consisted of advancing G & G Concrete credit in order for Jean Simpson to meet G & G Concrete's payroll obligation to the workers, as well as payment of workers' compensation insurance coverage, unemployment insurance, FICA and Medicare. Jean Simpson invoiced G & G Concrete weekly for this sum along with an added percentage which was profit to Jean Simpson.