WELCH, J.
A materialman for a parish public works project filed suit against the general contractor, the surety that issued the performance bonds, and the subcontractor for the full amount of its statement of claim. The subcontractor filed a cross-claim against the general contractor and the surety for the full amount of its claim of lien or privilege and sought indemnification from the materialman. Following a bench trial limited in scope to the materialman's claims, the trial court rendered judgment in favor of the materialman and against the subcontractor for the full amount of the materialman's statement of claim. The judgment dismissed the materialman's claims against the general contractor and its surety, with prejudice. The materialman and the subcontractor have appealed. For the reasons that follow, we reverse in part, affirm in part, and remand.
FACTS AND PROCEDURAL HISTORY
The Orleans Parish School Board ("OPSB"), the owner, contracted with Woodrow Wilson Construction, LLC ("Woodrow Wilson"), a general contractor, for the construction of an elementary school ("project").[1] The contract was recorded on September 14, 2012.[2] Western *309 Surety Company ("Western Surety") provided the statutory performance and payment bonds to Woodrow Wilson for the project.
Woodrow Wilson subcontracted with Amtek of Louisiana, Inc. ("Amtek") for site work on the project.[3] Amtek then subcontracted with Baton Rouge Winwater Works Co. ("BR Winwater"), a materialman, to supply PVC storm drainage pipe, in-line drains, and pipe for installation into the project. Woodrow Wilson, Amtek, and BR Win water executed a joint check agreement, whereby Woodrow Wilson agreed to pay Amtek and BR Winwater by joint check for all services rendered in connection with the project. Although executed by Woodrow Wilson in October 2012, the joint check agreement was not fully executed by all the parties and received by Woodrow Wilson until October 30, 2014.
BR Winwater made ten deliveries of materials to Amtek, from March 25, 2014 to June 11, 2014. It is undisputed that BR Winwater's materials were delivered, received in "good condition" by Amtek, and installed into the project. It is further undisputed that Amtek billed Woodrow Wilson for BR Winwater's materials; Woodrow Wilson billed OPSB for all materials furnished by BR Winwater; and, OPSB fully paid Woodrow Wilson for the materials supplied by BR Winwater.
At some point during the project, a dispute arose between Woodrow Wilson and Amtek. After sending notices of default to Amtek on March 14, 2014 and June 10, 2014, Woodrow Wilson terminated Amtek's subcontract on June 20, 2014. On August 14, 2014, Amtek filed a claim of lien or privilege on the project in the amount of $280,272.15, which included unpaid amounts owed to BR Winwater, as well as unpaid amounts owed to other subcontractors of Amtek.[4]
It is undisputed that Woodrow Wilson, Western Surety, and Amtek have made no payments to BR Winwater for the materials it supplied for the project. Accordingly, BR Winwater transmitted notice of nonpayment to Woodrow Wilson via certified mail on October 29, 2014. BR Winwater transmitted a second notice of nonpayment to Woodrow Wilson via facsimile on November 24, 2014.
A certificate of substantial completion for the project was recorded on December 2, 2014.[5]
BR Winwater filed a statement of claim on January 5, 2015, alleging it was owed $79,240.00 for the materials it supplied to Amtek on the project, plus the cost of filing the statement of claim.[6] Also on January 5, 2015, BR Winwater transmitted notices of filing its statement of claim as well as demand letters to OPSB, Woodrow *310 Wilson, and Western Surety via certified mail. On January 27, 2015, BR Winwater transmitted a second demand letter to Western Surety, via certified mail.
On April 1, 2015, Woodrow Wilson filed a petition for damages and breach of contract against Amtek.[7] Amtek answered Woodrow Wilson's suit and filed a reconventional demand against Woodrow Wilson and Western Surety, alleging that it had not been paid by Woodrow Wilson for the work it performed on the project.
On October 1, 2015, BR Winwater filed a petition for damages against Woodrow Wilson, Amtek, and Western Surety.[8] Amtek answered BR Winwater's suit and filed a cross claim against Woodrow Wilson and Western Surety for amounts due and for indemnification from BR Winwater's claim.
The Woodrow Wilson Suit and the BR Winwater Suit were ultimately consolidated and transferred to Division "D" of the 19th Judicial District Court ("JDC"), pursuant to a judgment signed on October 5, 2016. Prior to trial, Woodrow Wilson and Amtek stipulated in camera that the claims between Woodrow Wilson and Amtek (the subject of the Woodrow Wilson Suit and Amtek's cross claim in the BR Winwater Suit) would be reserved pending the resolution of a separate, related lawsuit in Civil District Court in Orleans Parish (the "Beverly Suit").[9]
Following a bench trial held on January 31, 2017, solely on BR Winwater's claims against Woodrow Wilson, Western Surety, and Amtek, the trial court rendered judgment on March 9, 2017, stating in pertinent part:
The court finds that no notice was given to Woodrow Wilson by BR Winwater that Amtek had defaulted on its payment obligations until after a lapse of time for issuing a notice of non payment. Therefore, Woodrow Wilson and its surety Western have no obligations to pay Amtek?s [sic ] debt to Winwater. Nonetheless, Winwater would have rights over and against Amtek for the amount of unpaid invoices. Judgment to be signed accordingly.
The trial court signed a judgment in accordance with its ruling on May 2, 2017, in favor of BR Winwater and against Amtek, in the amount of $79,240.90, plus interest and costs. The judgment dismissed BR Winwater's claims against Woodrow Wilson and Western Surety, with prejudice. BR Winwater and Amtek now appeal the May 2, 2017 judgment of the trial court.
ASSIGNMENTS OF ERROR
In its sole assignment of error, BR Winwater contends the trial court erred in dismissing its claims against Woodrow Wilson and Western Surety under La. R.S. 38:2242(B) and La. R.S. 38:2247.
Amtek assigns three errors to the trial court's judgment:
1. The Trial Court erred in dismissing BR Winwater's claim against [Woodrow] Wilson, general contractor, and Western [Surety], as [Woodrow] Wilson's surety, under La. R.S. 38:2242(B) and 2247.
2. The Trial Court erred in granting judgment against Amtek on BR Winwater's *311 claims when the evidence showed that [Woodrow] Wilson was paid by the OPSB for the materials, but never paid Amtek for the materials supplied by BR Winwater. [Woodrow] Wilson violated La. R.S. 9:2784 by failing to pay BR Winwater and/or Amtek after it was paid by the owner.
3. The Trial Court erred in failing to grant judgment against [Woodrow] Wilson and Western [Surety] in favor of BR Winwater because [Woodrow] Wilson was fully paid by the [OPSB] and violated La. RS. 9:2784 and the Joint Check Agreement when it failed to pay BR Winwater after [Woodrow] Wilson received full payment for BR Winwater's materials.
LAW & DISCUSSION
Materialman Claimant's Right of Action on Bond
Relevant Law
Public construction contracts are governed by the Louisiana Public Works Act ("LPWA"), La. R.S. 38:2241, et seq. , which provides the exclusive remedies to parties in litigation arising out of a public work. State Through Div. of Admin . v. Mc I nnis Bros. Const., 97-0742 (La. 10/21/97), 701 So.2d 937, 944. Discussing the LPWA, in Pierce Foundations, Inc. v. Jaroy Constr., Inc., 2015-0785 (La. 5/3/16), 190 So.3d 298, 301, the Louisiana Supreme Court noted that in 1918, the legislature enacted Act 224, the precursor to the modem LPWA, to "protect those performing labor and furnishing materials for public works." The LPWA also protects a public entity complying with the requirements of the statute from expenses caused by the failure of the general contractor to perform the contract. Wilkin v. Dev Con Builders, Inc., 561 So.2d 66, 71 (La. 1990). The LPWA is sui generis and provides the exclusive remedies to parties in public construction work. Mc I nnis Bros. Const., 701 So.2d at 944.
The LPWA accomplishes its purpose of protecting laborers and suppliers of materials on public works by mandating that when a public entity enters into a contract for the construction, alteration, or repair of a public work in excess of $25,000.00, the contractor is required to post a bond "in a sum of not less than fifty percent of the contract price for the payment by the contractor or subcontractor to claimants as defined in R.S. 38:2242." La. R.S. 38:2241(A)(2) ; Pierce Foundations, Inc., 190 So.3d at 301. The bond serves as an additional fund or security to assure that those who perform work on public projects receive payment for their work in the event of a contractor's inability to fulfill its payment obligations. It insures against unpaid claims from parties supplying labor and materials for the construction of public works. Glencoe Educ. Found., Inc. v. Clerk of Court & Recorder of Mortgages for Par. of St. Mary, 2010-1872 (La. App. 1st Cir. 5/6/11), 65 So.3d 225, 231, writ denied, 2011-1142 (La. 10/21/11), 73 So.3d 383. The bond requirements of the LPWA also serve to protect the public entity from loss and expense arising out of the failure of the contractor to faithfully perform the contract. In essence, the payment bond transfers the risk that a contractor will be unable to perform its contractual obligations from the public entity to the surety. Id. (citing Wilkin, 561 So.2d at 71 ).
The category of "claimants" who are entitled to recovery under the LPWA includes any person to whom money is due pursuant to a contract with the owner, contractor, or subcontractor for doing work, performing labor, or furnishing material or supplies for the construction of *312 any public work. La. R.S. 38:2242(A). One method for claimants to assert claims under the LPWA is set forth in La. R.S. 38:2242(B), which provides:
Any claimant may after the maturity of his claim and within forty-five days after the recordation of acceptance of the work by the governing authority or of notice of default of the contractor or subcontractor, file a sworn statement of the amount due him with the governing authority having the work done and record it in the office of the recorder of mortgages for the parish in which the work is done.
Unlike laborers and suppliers involved in private building projects, similarly situated workers and suppliers engaged by public entities on building projects cannot protect themselves with liens against public property because liens are not enforceable against publicly-owned property. Mc I nnis Bros. Const., 701 So.2d at 943. A claimant's filing of a statement of claim does not grant a lien on the public work, but grants the claimant a privilege against the unexpended funds in the possession of the public authority. Pierce Foundations, Inc., 190 So.3d at 301 (citing Wilkin, 561 So.2d at 70 ). It "preserves the claimant's statutory privilege whereby he is entitled to payment from the governing authority in preference to any payment due by the authority to the general contractor." See Apex Bldg. Techs. Grp., Inc. v. Catco Gen. Contractors, L.L.C., 2015-729 (La. App. 5th Cir. 3/30/16), 189 So.3d 1209, 1213 (citing Wilkin, 561 So.2d at 70, 75 ).
Under the LPWA, a claimant also has one year from the registry of acceptance of the work (or of notice of default of the contractor) to bring an action on the bond against the surety, contractor, or both. This process is set forth in La. R.S. 38:2247, which provides:
Nothing in this Part shall be construed to deprive any claimant, as defined in this Part and who has complied with the notice and recordation requirements of R.S. 38:2242(B), of his right of action on the bond furnished pursuant to this Part, provided that said action must be brought against the surety or the contractor or both within one year from the registry of acceptance of the work or of notice of default of the contractor; except that before any claimant having a direct contractual relationship with a subcontractor but no contractual relationship with the contractor shall have a right of action against the contractor or the surety on the bond furnished by the contractor, he shall in addition to the notice and recordation required in R.S. 38:2242(B) give written notice to said contractor within forty-five days from the recordation of the notice of acceptance by the owner of the work or notice by the owner of default, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor or service was done or performed. Such notice shall be served by mailing the same by registered or certified mail, postage prepaid, in an envelope addressed to the contractor at any place he maintains an office in the state of Louisiana. [Emphasis added.]
See also Bd. of Sup'rs of Louisiana State Univ. v. Louisiana Agr. Fin. Auth., 2007-0107 (La. App. 1st Cir. 2/8/08), 984 So.2d 72, 85. As stated above, a claimant not in privity of contract with the general contractor must in addition to the notice and recordation requirements of La. R.S. 38:2242(B) give written notice via certified mail to the contractor within 45 days from the recordation of the notice of acceptance *313 by the owner of the public work in order to bring an action on the bond. La. R.S. 38:2247.
In Pierce Foundations, Inc., 190 So.3d at 304, the supreme court explained that the plain language of La. R.S. 38:2242(B) and La. R.S. 38:2247 conflict because La. R.S. 38:2242(B) provides that a claimant "may" file a sworn statement, but La. R.S. 38:2247 refers to the recordation "requirements" of La. R.S. 38:2242(B). Because of this ambiguity, the supreme court pursued statutory meaning in the context of the statute as a whole, with particular focus on the LPWA's purpose, and concluded that it was a fundamental error to render the permissive "may" in La. R.S. 38:2242(B) -"[a]ny claimant may ... file a sworn statement"-mandatory in La. R.S. 38:2247. Pierce Foundations, Inc., 190 So.3d at 304. The supreme court held that where a claimant fails to comply with the notice and recordation requirements of La. R.S. 38:2242(B), the claimant loses his privilege against the funds in the hands of the public authority; however, the failure to comply with La. R.S. 38:2242(B) does not affect the right of the claimant, in contractual privity with the contractor, to proceed directly against the contractor and its surety on the bond pursuant to La. R.S. 38:2247.[10] Pierce Foundations, Inc., 190 So.3d at 304.
In this case, the trial court concluded that BR Winwater failed to give the appropriate materialman claimant's notice of nonpayment to the general contractor Woodrow Wilson that the subcontractor Amtek had defaulted on its payment obligations for materials supplied by BR Winwater, as set forth in La. R.S. 38:2242(F). Louisiana Revised Statutes 38:2242(F) provides:
In addition to the other provisions of [ La. R.S. 38:2242 ], if the materialman has not been paid by the subcontractor and has not sent notice of nonpayment to the general contractor and the owner, then the materialman shall lose his right to file a privilege or lien on the immovable property. The return receipt indicating that certified mail was properly addressed to the last known address of the general contractor and the owner and deposited in the U.S. mail on or before seventy-five days from the last day of the month in which the material was delivered, regardless of whether the certified mail was actually delivered, refused, or unclaimed satisfies the notice provision hereof or no later than the statutory lien period, whichever comes first. The provisions of this Subsection shall apply only to disputes arising out of recorded contracts. [Emphasis added.]
To plainly state La. R.S. 38:2242(F), prior to filing a lien or privilege, a materialman must give written notice of nonpayment via certified mail to the general contractor and owner within 75 days from the last day of the month in which the materials were delivered.
On appeal, BR Winwater and Amtek contend the trial court erred in dismissing BR Winwater's claim against Woodrow Wilson and Western Surety under La. R.S. 38:2242(B) and La. R.S. 38:2247, arguing that BR Winwater has a right to recover against Woodrow Wilson and Western Surety in accordance with La. R.S. 38:2247, because BR Winwater timely filed its statement of claim pursuant to *314 La. R.S. 38:2242(B) and further complied with the filing and notice requirements of La. R.S. 38:2247. Furthermore, BR Winwater and Amtek contend that Woodrow Wilson was fully paid by the owner, OPSB, for the materials supplied by BR Winwater.[11]
Woodrow Wilson and Western Surety argue, however, that prior to filing its statement of claim in accordance with La. R.S. 38:2242(B), the LPWA required BR Winwater, as a materialman supplying materials on the project, to comply with the materialman's notice of nonpayment requirement set forth in La. R.S. 38:2242(F). Thus, Woodrow Wilson and Western Surety argue that compliance with La. R.S. 38:2242(B)and La. R.S. 38:2242(F) is required before a materialman claimant may pursue a right of action on the statutory bond under La. R.S. 38:2247. It is undisputed that BR Winwater did not transmit notice of nonpayment via certified mail to the general contractor Woodrow Wilson and the owner OPSB within 75 days from the last day of the month in which the materials were delivered, in accordance with La. R.S. 38:2242(F).[12]
This case involves the interpretation of three provisions of the LPWA: La. R.S. 38:2242(B), La. R.S. 38:2242(F), and La. R.S. 38:2247. The issue before this court is whether the LPWA requires a materialman to comply with La. R.S. 38:2242(B)and La. R.S. 38:2242(F) in order to file an action against the general contractor and/or surety on the bond, as set forth in La. R.S. 38:2247. Questions of law, such as the proper interpretation of a statute, are reviewed by this court under the de novo standard of review. Louisiana Mun. Ass'n v. State, 2004-0227 (La. 1/19/05), 893 So.2d 809, 836. Additionally, because this matter involves the LPWA, it must be strictly construed. Wilkin, 561 So.2d at 75.
Analysis
Legislation is the solemn expression of legislative will and, thus, the interpretation of legislation is primarily the search for the legislative intent. Red Stick Studio Dev., L.L.C. v. State ex rel. Dep't of Econ. Dev., 2010-0193 (La. 1/19/11), 56 So.3d 181, 187. When a law is clear and unambiguous, and its application does not lead to absurd consequences, it shall be applied as written, with no further interpretation made in search of the legislative intent. La. C.C. art. 9 ; La. R.S. 1:3 ; La. R.S. 1:4. The starting point in the interpretation of any statute is the language of the statute itself. Mayeux v. Charlet, 2016-1463 (La. 10/28/16), 203 So.3d 1030, 1036. What a legislature says in the text of a statute is considered the best evidence of its intent and will. La. R.S. 24:177(B)(1). Furthermore, all laws pertaining to the same subject matter must be read in pari materia. La. C.C. art. 13 ; State v. Gutweiler, 2006-2596 (La. 4/8/08), 979 So.2d 469, 476.
If however, the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. La. C.C. art. 10 ; M.J. Farms, Ltd. v. Exxon Mobil Corp., 2007-2371 (La. 7/1/08), 998 So.2d 16, 27, amended on reh'g (Sept. 19, 2008). Moreover, when the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole. La. C.C. art. 12 ; M.J. Farms, Ltd., 998 So.2d at 27.
It is also well established that the Legislature is presumed to enact each *315 statute with deliberation and with full knowledge of all existing laws on the same subject. State v. Campbell, 2003-3035 (La. 7/6/04), 877 So.2d 112, 117. Thus, legislative language will be interpreted on the assumption the Legislature was aware of existing statutes, well established principles of statutory construction, and with knowledge of the effect of their acts and a purpose in view. Id. It is equally well settled under our rules of statutory construction, where it is possible, courts have a duty in the interpretation of a statute to adopt a construction which harmonizes and reconciles it with other provisions dealing with the same subject matter. La. C.C. art. 13 ; City of New Orleans v. Louisiana Assessors' Ret. & Relief Fund, 2005-2548 (La. 10/1/07), 986 So.2d 1, 15, on reh'g (Jan. 7, 2008). The legislative history of an act and contemporaneous circumstances are also helpful guides in ascertaining legislative intent. Exxon Pipeline Co. v. Louisiana Public Service Com'n , 98-1737 (La. 3/2/99), 728 So.2d 855, 860.
At the outset, we distinguish between La. R.S. 38:2242 -setting forth a claimant's right to file a statement of claim that grants him a privilege against the unexpended funds in the hands of the public entity-and La. R.S. 38:2247 -setting forth a claimant's right to file suit on the bond against the contractor and/or surety.
Louisiana Revised Statutes 38:2242 sets forth the process for a claimant to file a sworn statement of the amount due him. Louisiana Revised Statutes 38:2242(B) provides that a claimant "may" file a sworn statement. Like the supreme court noted in Pierce Foundations, Inc., the word "may" is permissive. 190 So.3d at 305. The use of the permissive "may" demonstrates that the privilege set forth in La. R.S. 38:2242(B) is an additional remedy provided by the LPWA to those contributing to the construction, alteration, or repair of public works, and in no way affects the preexisting contractual rights of parties. La. R.S. 1:3 ; Pierce Foundations, Inc., 190 So.3d at 305.
In contrast, La. R.S. 38:2242(F) provides that "[i]n addition to the other provisions of this Section,"-i.e. , the other provisions of La. R.S. 38:2242, including subsection (B)-if a materialman has not been paid by the subcontractor, the materialman must send notice of nonpayment to the general contractor and owner within 75 days from the last day of the month in which the materials were delivered, otherwise the materialman shall lose his right to file a privilege or lien.[13]
Based upon a plain reading of La. R.S. 38:2242(B) and La. R.S. 38:2242(F), a materialman's failure to provide the 75-day notice of nonpayment to *316 the general contractor and owner results only in the materialman's loss of the right to file a privilege against the unexpended funds in the hands of the public entity.
The inclusion of the phrase, "[i]n addition to the other provisions of this Section", found in La. R.S. 38:2242(F), conflicts with the language of La. R.S. 38:2242(B) by rendering the permissive "may" in La. R.S. 38:2242(B) mandatory by requiring a materialman claimant to file a sworn statement and give the 75-day notice of nonpayment to the general contractor and the owner, otherwise, the materialman claimant loses his right to file a privilege against the unexpended funds in the hands of the public entity.
Unlike La. R.S. 38:2242, La. R.S. 38:2247 sets forth the requirements for a claimant to file suit on the bond against the contractor and/or surety. Therein, La. R.S. 38:2247 refers to the recordation "requirements" of La. R.S. 38:2242(B), providing that "[n]othing in this Part"-i.e. , Part III of Chapter 10 of Title 38 of the Revised Statutes, which is La. R.S. 38:2241 -2249-"shall be construed to deprive any claimant ... who has complied with the notice and recordation requirements of R.S. 38:2242(B), of his right of action on the bond furnished pursuant to this Part." If the claimant does not have a direct contractual relationship with the general contractor, La. R.S. 38:2247 further requires that said claimant give written notice to the contractor within 45 days from the recordation of the acceptance. Aside from the mention of La. R.S. 38:2242(B), La. R.S. 38:2247 contains no mention of La. R.S. 38:2242(F)'s materialman claimant 75-day notice of nonpayment requirement. Furthermore, La. R.S. 38:2247 states that "[n]othing in this Part"-including La. R.S. 38:2242(F) -"shall be construed to deprive any claimant ... of his right of action on the bond." If the Legislature had intended to require materialman claimants to provide the 75-day notice of nonpayment to the general contractor and owner, or be deprived of his right of action on the statutory bond, the Legislature would have included such language in La. R.S. 38:2247 ; however, it did not.
Furthermore, in Pierce Foundations, Inc., 190 So.3d at 304, our supreme court held that where a subcontractor fails to comply with the notice and recordation requirements of La. R.S. 38:2242(B), the subcontractor loses his privilege against the funds in the hands of the public authority; however, the failure to comply with La. R.S. 38:2242(B) does not affect the right of the subcontractor, in contractual privity with the general contractor, to proceed directly against the general contractor and its surety under La. R.S. 38:2247. A fortiori , a materialman claimant's failure to comply with La. R.S. 38:2242(F) does not affect the right of a materialman claimant (who also gave the La. R.S. 38:2247 45-day notice to the general contractor due to lack of contractual privity with same) to proceed directly against the contractor and the surety on the bond pursuant to La. R.S. 38:2247.
In the matter before us, not only did BR Winwater comply with La. R.S. 38:2242(B), BR Winwater also provided the additional 45-day notice to Woodrow Wilson due to its lack of privity of contract. La. R.S. 38:2247. The last month that BR Winwater supplied materials on the project was June 2014.[14] The acceptance of work was recorded on December 2, 2014.[15] BR Winwater *317 filed a statement of claim on January 5, 2015, within 45 days of the recordation of acceptance of work, in accordance with La. R.S. 38:2242(B). BR Winwater filed suit on October 1, 2015, against the general contractor, Woodrow Wilson, its surety, Western Surety, and the subcontractor, Amtek, within one year from the registry of the acceptance of work, as set forth in La. R.S. 38:2247. Additionally, since BR Winwater was not in contractual privity with Woodrow Wilson, BR Winwater gave written notice via certified mail to Woodrow Wilson within 45 days from the recordation of the acceptance of work, in accordance with La. R.S. 38:2247. Therefore, we conclude that Woodrow Wilson and Western Surety were sufficiently notified of the claim for purposes of filing suit on the bond pursuant to La. R.S. 38:2247.
Our interpretation best comports with the purpose of the LPWA, which again, is to "protect those performing labor and furnishing materials for public works." Pierce Foundations, Inc., 190 So.3d at 304 (citing Wilkin, 561 So.2d at 70 ). The effect of the LPWA is to give certain classes of persons not enjoying privity of contract with the general contractor or with the public entity a claim nevertheless against the contractor and his surety, and in some instances, a claim against the public entity itself. Pierce Foundations, Inc., 190 So.3d at 305 (citing Wilkin, 561 So.2d at 70 ). Louisiana Revised Statutes 38:2247 does not mention the 75-day notice set forth in La. R.S. 38:2242(F). When the Legislature amended La. R.S. 38:2242 in 1999 to add Subsection F, it was fully aware of La. R.S. 38:2247, yet chose not to amend La. R.S. 38:2247 to additionally require that a materialman claimant comply with La. R.S. 38:2242(F) in order to preserve his right of action on the bond. The conflicting language of these statutes is best addressed by the Louisiana Law Institute and the Legislature.
It is undisputed that BR Winwater complied with the requirements of La. R.S. 38:2242(B) and La. R.S. 38:2247. It is also undisputed that BR Winwater did not comply with La. R.S. 38:2242(F). Applying the LPWA as written, BR Winwater has only lost its right to file a privilege against the unexpended funds in the possession of the OPSB. While BR Winwater has lost its right to a privilege against those funds, BR Winwater is not precluded from filing suit on the bond against the general contractor, Woodrow Wilson, and its surety, Western Surety. BR Winwater is not seeking to enforce a lien or privilege on the public work; it is seeking to enforce its *318 right of action on the bond against the general contractor and the surety under La. R.S. 38:2247 as a claimant. There is no language in the LPWA prohibiting BR Winwater from recovering on the bond against Woodrow Wilson and Western Surety, even if it failed to comply with La. R.S. 38:2242(F).
On appeal, Woodrow Wilson and Western Surety contend that this court established that compliance with both La. R.S. 38:2242(B)and La. R.S. 38:2242(F) is required by the LPWA before a materialman claimant may preserve a right of action on the bond under La. R.S. 38:2247 in J. Reed Constructors, Inc. v. Roofing Supply Grp., L.L.C., 2012-2136 (La. App. 1st Cir. 11/1/13), 135 So.3d 752, 755, writ denied, 2014-1031 (La. 9/12/14), 148 So.3d 931. In J. Reed Constructors, a subcontractor on a public works project purchased roofing supplies and materials on an open account from the materialman. 135 So.3d at 753-54. At various times through June, July, August, and September 2011, with the last delivery occurring on September 26, 2011, the materialman delivered materials to the project site. After the subcontractor failed to pay for the materials, the materialman transmitted written notice of nonpayment to the general contractor and owner on December 8, 2011, which was undisputedly sent within 75 days of the last delivery date (September 26, 2011). J. Reed Constructors, 135 So.3d at 754. The issue before this court was whether that single notice given by the materialman in December 2011 within 75 days of the last delivery of the materials was timely as to the materialman's claim for payment on all materials previously delivered pursuant to the open-account arrangement. This court held that the materialman was required to send notice of nonpayment within 75 days of the last day of each month in which materials were delivered. In discussing the 75-day notice provision set forth in La. R.S. 38:2242(F), the J. Reed Constructors court stated, "the materialman claimant must first comply with the notice and recordation requirements of La. R.S. 38:2242(B) and (F) in order to preserve the right to file a privilege or lien." 135 So.3d at 755.
J. Reed Constructors is factually distinguishable from the case before us for several reasons. First, in J. Reed Constructors, the materialman did not file a statement of claim in accordance with La. R.S. 38:2242(B) ; the materialman had merely transmitted one notice of nonpayment pursuant to La. R.S. 38:2242(F) to the general contractor and owner. In the instant matter, BR Winwater filed a statement of claim within 45 days of the recordation of acceptance of work in accordance with La. R.S. 38:2242(B). Additionally, since BR Winwater was not in contractual privity with Woodrow Wilson, BR Winwater gave written notice via certified mail to Woodrow Wilson within 45 days from the recordation of the acceptance of work, pursuant to La. R.S. 38:2247. Second, the J. Reed Constructors court's conclusion that a "materialman claimant must first comply with the notice and recordation requirements of La. R.S. 38:2242(B) and (F) in order to preserve the right to file a privilege or lien" does not apply to the case before us. BR Winwater is not attempting to enforce a privilege on the funds held by the OPSB. BR Winwater is seeking to enforce its right of action on the bond against Woodrow Wilson and Western Surety. Finally, the issue of a materialman claimant preserving a right of action on the statutory bond as set forth in La. R.S. 38:2247 was not before the court in J. Reed Constructors. In the instant matter, a materialman claimant's right of action on the bond as set forth in La. R.S. 38:2247 court, and whether compliance with both La. R.S. 38:2242(B) and *319 La. R.S. 38:2242(F) is necessary before pursing said action, is the issue squarely before this court in the instant case.[16]
The second and third circuits have held that La. R.S. 38:2242(F) requires notice of nonpayment be given to the general contractor and owner before a materialman claimant files a lien or privilege in accordance with La. R.S. 38:2242(B). However, those circuits distinguish between the 75-day notice of nonpayment set forth in La. R.S. 38:2242(F) and the 45-day notice referenced in La. R.S. 38:2247.[17] The 75-day notice of nonpayment set forth in La. R.S. 38:2242(F) is to be given by the materialman claimant to the general contractor and owner to preserve the materialman claimant's right to file a statement of claim as set forth in La. R.S. 38:2242(B). In contrast, the notice referenced in La. R.S. 38:2247 is to be given by a claimant who is not in privity of contract with the general contractor to the general contractor to preserve the claimant's right of action on the bond against the contractor or the surety or both. In addition, the 75-day notice requirement La. R.S. 38:2242(F) would be untimely if it were given before a claim was filed, but after 75 days had elapsed since the last day of the month in which material was delivered. It would be immaterial in that case if the 45-day statutory lien period had not elapsed. The notice requirement found in La. R.S. 38:2247 references only the 45-day statutory lien period provided in La. R.S. 38:2242(B). See Elec. Supply Co. v. Great Am. Ins. Co., 42,727 (La. App. 2nd Cir. 12/12/07), 973 So.2d 827, 829-31 (the "clear" language of Section 2242(F) requires notice before filing lien); Teche Elec. Supply, L.L.C. v. M.D. Descant, Inc., 2008-171 (La. App. 3rd Cir. 12/11/08), 2 So.3d 516, 520-22, writ denied, 2009-0086 (La. 3/27/09), 5 So.3d 141 (claimant's failure to furnish notice of nonpayment before filing its lien defeated the claimant's claim, even though defendants unquestionably had actual notice two weeks after the lien was filed).[18]
*320 Conclusion
Giving full effect to the language of La. R.S. 38:2247, which states in relevant part, "[n]othing in this Part shall be construed to deprive any claimant, as defined in this Part and who has complied with the notice and recordation requirements of R.S. 38:2242(B), of his right of action on the bond furnished pursuant to this Part," BR Winwater only lost its right to a privilege against the unexpended funds in the possession of the OPSB for its failure to comply with La. R.S. 38:2242(F). Had the Legislature intended to require materialman claimants to comply with La. R.S. 38:2242(F) prior to proceeding against the contractor and the surety on the statutory bond, they would have amended La. R.S. 38:2247 to do so. They did not. Thus, we hold that BR Winwater has preserved its right of action on the bond against Woodrow Wilson and Western Surety. Accordingly, we hold that the trial court erred in dismissing BR Winwater's claims against Woodrow Wilson and Western Surety.
Louisiana's Prompt Pay Statute, La. R.S. 9:2784 ; Joint Check Agreement
In its second assignment of error, Amtek argues that Woodrow Wilson violated Louisiana's Prompt Pay Statute, La. R.S. 9:2784, by failing to pay Amtek for the materials supplied by BR Winwater after it was paid by the owner, OPSB, for the materials. Similarly, in its third and final assignment of error, Amtek contends that the trial court erred in failing to grant judgment against Woodrow Wilson and Western Surety, in favor of BR Winwater, arguing that Woodrow Wilson violated La. R.S. 9:2784 and the parties' joint check agreement when it failed to issue joint checks payable to Amtek and BR Winwater after it was fully paid by the owner, OPSB.
Louisiana's Prompt Pay Statute, La. R.S. 9:2784, provides, in relevant part:
A. When a contractor receives any payment from the owner for improvements to an immovable after the issuance of a certificate of payment by the architect or engineer, or when a contractor receives any payment from the owner for improvements to an immovable when no architect or engineer is on the job, the contractor shall promptly pay such monies received to each subcontractor and supplier in proportion to the percentage of work completed prior to the issuance of the certificate of payment by such subcontractor and *321 supplier, or by the owner if no architect or engineer is on the job. Further, whenever a subcontractor receives payment from the contractor, the subcontractor shall promptly pay such monies received to each sub-subcontractor and supplier in proportion to the work completed.
* * *
C. If the contractor or subcontractor without reasonable cause fails to make any payment to his subcontractors and suppliers within fourteen consecutive days of the receipt of payment from the owner for improvements to an immovable, the contractor or subcontractor shall pay to the subcontractors and suppliers, in addition to the payment, a penalty in the amount of one-half of one percent of the amount due, per day, from the expiration of the period allowed herein for payment after the receipt of payment from the owner. The total penalty shall not exceed fifteen percent of the outstanding balance due. In addition, the contractor or subcontractor shall be liable for reasonable attorney fees for the collection of the payments due the subcontractors and suppliers. However, any claim which the court finds to be without merit shall subject the claimant to all reasonable costs and attorney fees for the defense against such claim. [Emphasis added.]
Statutes providing for punitive penalties are rare, and as such, when a statute does authorize the imposition of a penalty, it is to be strictly construed. Int'l Harvester Credit Corp. v. Seale, 518 So.2d 1039, 1041 (La. 1988).
The Prompt Pay Statute is not a part of the LPWA. The statute is found in Title 9 of the Revised Statutes, the "Civil Code Ancillaries," to Book III, Title IV, "Conventional Obligations or Contracts." While a statute's heading is not the law, it provides some guidance as to what the Legislature intended the statute to cover. See Anderson v. Ochsner Health Sys., 2013-2970 (La. 7/1/14), 172 So.3d 579, 581. A construction contract, such as the contracts between OPSB and Woodrow Wilson, Woodrow Wilson and Amtek, and Amtek and BR Winwater, is a conventional obligation that constitutes the law between the parties, and courts are obligated to give legal effect to such contracts according to the true intent of the parties. See La. C.C. arts. 2045 - 2047.
Joint check agreements-where a check is issued jointly to two or more parties (e.g. , to a subcontractor and a materials supplier)-are widely used in the construction industry. General contractors often use joint checks to ensure their subcontractors properly disburse the proceeds of progress payment checks to their sub-subcontractors and suppliers. See 1 Construction Contracts Deskbook § 21:1 (Nick J. Vizy, ed., 2017), available on WESTLAW . A joint check agreement is a conventional obligation that constitutes the law between the parties. Courts are obligated to give legal effect to such contracts according to the true intent of the parties. See La. C.C. arts. 2045 - 2047.
The evidence established at trial indicated the joint check agreement was prepared by Woodrow Wilson on behalf of Amtek and BR Winwater. The joint check agreement, dated October 11, 2012, provides:
As an accommodation to our subcontractor, Amtek of La., Inc. and to assist it in the obtainment of materials to be consumed and/or incorporated in the above-referenced project this will evidence our agreement to make checks jointly payable to Amtek of La., Inc. and Baton Rouge Winwater Works Co. for payment of materials ordered by Amtek of La., Inc. in an amount not to exceed *322 $50,000.00 [handwritten notation in margin increased the amount to "$60,000.00"] and delivered to the above-referenced project site, which materials are actually consumed in and/or incorporated in the above-referenced construction site. Such payments shall be made as and when provided in the subcontract agreement between WOODROW WILSON CONSTRUCTION COMPANY, INC. and Amtek of La., Inc. upon presentation to WOODROW WILSON CONSTRUCTION COMPANY, INC. of (1) an invoice evidencing the purchase of such materials, and (2) proof acceptable to WOODROW WILSON CONSTRUCTION COMPANY, INC. of delivery of such materials to the project site.
This agreement is not, and nothing herein stated shall be construed to create, a contract or agreement between WOODROW WILSON CONSTRUCTION COMPANY, INC. and Baton Rouge Winwater Works Co. an agreement or guaranty or surety, or an assignment of all or any part of the subcontract agreement between WOODROW WILSON CONSTRUCTION COMPANY, INC. and Amtek of La., Inc.
Woodrow Wilson signed the joint check agreement on October 11, 2012. Amtek signed the joint check agreement on October 15, 2012. BR Winwater then signed the joint check agreement on March 14, 2014, nearly two years after Woodrow Wilson had issued and signed the joint check agreement. Woodrow Wilson received a copy of the final, executed joint check agreement on October 30, 2014.[19]
When Woodrow Wilson received the final, executed version of the joint check agreement, Amtek's subcontract had been terminated for approximately four months (since June 20, 2014). The last payment Woodrow Wilson tendered to Amtek is dated May 23, 2014, which is approximately five months prior to Woodrow Wilson receiving the fully executed joint check agreement. Since the joint check agreement was not in effect at the time Woodrow Wilson issued its last payment to Amtek prior to terminating Amtek's subcontract, Woodrow Wilson had no obligation to issue checks jointly to Amtek and BR Winwater; therefore, Woodrow Wilson did not breach the joint check agreement.
The joint check agreement did not obligate Woodrow Wilson to make any payments to BR Winwater, but only gave Woodrow Wilson the contractual right to do so out of any payments Woodrow Wilson made to Amtek, and only for materials Amtek purchased from BR Winwater. The joint check agreement prevented Amtek from refusing to authorize Woodrow Wilson to make payments to BR Winwater since Woodrow Wilson did not have a contract with BR Winwater, Amtek's materialman.
*323 Absent from La. R.S. 9:2784 is any requirement that a general contractor such as Woodrow Wilson must promptly pay a materialman with whom he does not stand in contractual privity.
Furthermore, we cannot read the terms of the joint check agreement into the statutory bond provided by Western Surety. The LPWA is sui generis and must be strictly construed and applied. Mc I nnis Bros. Const., 701 So.2d at 944 ; Wilkin, 561 So.2d at 75. Amtek and BR Winwater's claims arising under the joint check agreement cannot be brought against Western Surety, whose liability is limited as provided in the LPWA.
While Amtek may assert a cause of action against Woodrow Wilson under La. R.S. 9:2784, Amtek must pursue that cause of action in the separate proceeding pending in Orleans Parish in the Beverly Suit, since the parties stipulated that the only claims at issue before the trial court in this matter were BR Winwater's claims. Thus, Woodrow Wilson's suit against Amtek, and Amtek's reconventional demand and cross claim against Woodrow Wilson and Western Surety regarding its claim of lien or privilege, are reserved for the Beverly Suit.
Accordingly, Amtek's second and third assignments of error are without merit.
DECREE
For the foregoing reasons, we reverse the portion of the trial court's May 2, 2017 judgment dismissing Baton Rouge Winwater Works Co.'s claims against Woodrow Wilson Construction, LLC and Western Surety Company, with prejudice. The judgment is affirmed in all other respects. We remand this matter for further proceedings consistent with this opinion. All costs of this appeal are assessed equally against Woodrow Wilson Construction, LLC, Western Surety Company, and Amtek of Louisiana, Inc.
JUDGMENT REVERSED IN PART, AFFIRMED IN ALL OTHER RESPECTS; REMANDED.

Project 2010-0789-0002; Date July 20, 2012; Price $26,720,000.00; New Alice Harte Elementary School, 5300 Berkley Drive, New Orleans, Louisiana 70131.

Instrument Number: 2012-34488; Recording Date: 09/14/2012 at 11:41:42 a.m.; Document Type: Contract; Mtg. Instrument No. 1100854; Price: $26,720,000.00; Surety: Western Surety Company.

The record contains no signed subcontract between Woodrow Wilson and Amtek. The original subcontract price was $573,813.00. The subcontract price was later increased to $660,675.05 via change orders.

Instrument Number: 2014-32162; Recording Date: 08/15/2014 at 04:27:02 p.m.; Document Type: Labor/Material Lien; Mtg. Instrument No. 1166260.

Instrument Number: 2014-48175; Recording Date: 12/02/2014 at 11:08:29 a.m.; Document Type: Substantial Completion; Mtg. Instrument No. 1174989.

Instrument Number: 2015-00207; Recording Date: 01/05/2015 at 11:39:13 a.m.; Document Type: Labor/Material Lien; Mtg. Instrument No. 1177425.
Two other suppliers who subcontracted with Amtek also filed liens on the property: Beverly Industries, LLC and Capitol Concrete Products, LLC.

"Woodrow Wilson Suit," Docket No. 638,278, 19th JDC, East Baton Rouge Parish, Louisiana.

"BR Winwater Suit," Docket No. 642,725, 19th JDC, East Baton Rouge Parish, Louisiana.

Beverly Industries, L.L.C., another materialman who subcontracted with Amtek, filed suit against Woodrow Wilson, Western Surety, and Amtek on November 7, 2014 (the "Beverly suit"), Docket No. 2014-10784, Civil District Court, Orleans Parish, Louisiana.

In Pierce Foundations, Inc., 190 So.3d at 300, a subcontractor on a public works project sued the contractor and surety on the bond pursuant to La. R.S. 38:2247. It is undisputed that in Pierce Foundations, Inc. the subcontractor never filed a statement of claim pursuant to La. R.S. 38:2242(B).

BR Winwater's sole assignment of error; Amtek's first assignment of error.

Seventy-five days from June 30, 2014 was September 13, 2014.

Prior to the passage of La. R.S. 38:2242(F) in 1999 by 1999 La. Acts No. 1134, § 2 (eff. Aug. 15, 1999), a materialman claimant's right to file a privilege or lien in the described circumstances only required a statement of claim to be filed in the applicable court records. There was no requirement that notice be sent to the owners and contractors. Louisiana Revised Statutes 38:2242(F) mandates that a materialman claimant furnish notice of nonpayment to owners and contractors as a prerequisite to the right to file a privilege or lien on the project. Failure to do so results in the materialman claimant "los[ing] his right to file a privilege or lien on the immovable property." Requiring a materialman claimant to send notice of nonpayment to the general contractor and owner, who are not always aware of the materialman from whom a subcontractor has obtained materials, allows the general contractor and owner to withhold payment to the subcontractor so as to avoid ultimately having to make a double payment. See Elec. Supply Co. v. Great Am. Ins. Co., Inc., 42,727 (La. App. 2nd Cir. 12/12/07), 973 So.2d 827, 829-30. It follows then that the 75-day notice provision set forth in La. R.S. 38:2242(F) was clearly designed to protect the owner and general contractor from the subcontractor's failure to pay suppliers.

There is a discrepancy in the shipment dates on BR Winwater's final delivery to Amtek, order no. 259008-00. The delivery ticket indicates the materials were shipped on May 28, 2014; however, the invoice indicates the materials were shipped on June 11, 2014.

The certificate of substantial completion was effective as an acceptance for all purposes, including a "formal final acceptance" of the work as required by La. R.S. 38:2191(B). See Quality Design & Const., Inc. v. City of Gonzales ex rel. Berthelot, 2006-2211 (La. App. 1st Cir. 11/28/07), 977 So.2d 87, 92. Louisiana Revised Statutes 38:2241.1(A) requires the official representative of the public entity to record an acceptance of the public works no later than 30 calendar days after the date of completion or substantial completion of such work. Subsection (B) of La. R.S. 38:2241.1 defines "substantial completion" as the "finishing of construction ... to the extent that the public entity can use or occupy the public works or use or occupy the specified area of the public works for the use for which it was intended." Subsection B further provides that the "recordation of an acceptance in accordance with the provisions of this Section upon substantial completion shall be effective as an acceptance for all purposes under this Chapter."
The record in this matter reflects that OPSB, through an authorized representative, executed a "Certificate of Substantial Completion," in accordance with La. R.S. 38:2241.1 on November 24, 2014, whereby, "[t]he Owner accepts the Work or designed portion as substantially complete and will assume full possession...." The certificate of substantial completion was filed into the mortgage records of Orleans Parish on December 2, 2014. Thus, it was effective as the formal, final acceptance of work.

In another recent case interpreting provisions of the LPWA, Nu-Lite Electrical Wholesalers, LLC v. Axis Construction Group, LLC, 2017-1204 (La. App. 1st Cir. 4/9/18), 249 So.3d 10, 16-17, 2018 WL 1703964, at *5, this court ruled that a materialman claimant's statement of claim that was noticed and filed in accordance with La. R.S. 38:2242(B) prior to the public entity's filing of the acceptance of work did not affect the materialman's right to file suit on the bond against the contractor and surety under La. R.S. 38:2247. This court concluded that the contractor and surety were sufficiently notified of the claim. Id. The Nu-Lite case did not address the 75-day notice of nonpayment set forth in La. R.S. 38:2242(F). Id. at n.4.

We note that neither the opinion of a district court, the attorney general, nor other circuit courts is authoritative or binding on this court. Great Lakes Dredge & Dock Co., LLC v. State ex rel. Coastal Prot. & Restoration Auth., 2014-0249 (La. App. 1st Cir. 11/7/14), 167 So.3d 682, 690 n.7.

In Elec. Supply Co., the supplier of materials to subcontractor on a public works project recorded a statement of amount due in the mortgage records in accordance with La. R.S. 38:2242(B), and mailed a copy of the statement of claim to the project owner, general contractor, and subcontractor the next day. The materialman then sued the general contractor, subcontractor, and surety in accordance with La. R.S. 38:2247. The general contractor and surety moved to cancel the materialman's lien/privilege on the grounds that the materialman did not provide the 75-day notice as required by La. R.S. 38:2242(F) to the general contractor and owner. The trial court granted the motion to cancel the lien/privilege. Supplier appealed. The court of appeal held that the materialman was required to give the 75-day notice of the subcontractor's nonpayment, La. R.S. 38:2242(F), to the general contractor and owner before filing a lien or privilege, La. R.S. 38:2242(B), and affirmed the trial court's judgment cancelling the lien. See Elec. Supply Co., 973 So.2d at 828-31.
In Teche Elec. Supply, L.L.C. , a materialman sold and delivered electrical materials to a subcontractor on a public works project from April 2003 to February 2004. Not having been paid for the supplies, the materialman filed a statement of lien and privilege against the subcontractor on April 23, 2004. Materialman mailed a notice of nonpayment to the owner and general contractor on May 6, 2004. The owner accepted the project, with said acceptance recorded on February 14, 2005. On March 1, 2005, the materialman sued the owner, general contractor, and the sureties that issued the bonds for the public works project pursuant to La. R.S. 38:2247, for the full amount of its statement of lien and privilege, filed in accordance with La. R.S. 38:2242(B). Defendants filed a motion for summary judgment, contending the materialman failed to preserve its right to lien/privilege on the public works project when it failed to furnish notice of nonpayment within 75 days of the delivery of materials as required by La. R.S. 38:2242(F). The materialman filed a cross motion for summary judgment, arguing its letter mailed on May 6, 2004, sufficiently provided notice of nonpayment to the appropriate parties as required by law; and thus, urged it was entitled to judgment as a matter of law. The trial court entered summary judgment for the materialman (this was before the second circuit's decision Elec. Supply Co. was handed down). Defendants appealed. On appeal, the third circuit held that the materialman's failure to furnish notice of nonpayment prior to filing its lien rendered the lien invalid and extinguished the materialman's right to recover from the defendants, citing the second circuit's decision, Elec. Supply Co.See Teche Elec. Supply, L.L.C., 2 So.3d at 520-22.

Issues concerning the validity of the joint check agreement were revealed during trial. Although the witnesses at trial provided no identifying information, someone materially altered the joint check agreement after it was signed by Woodrow Wilson on October 11, 2012, but before it was signed by BR Winwater on March 14, 2014, by making a notation in the right margin of the agreement that increased the potential liability from $50,000.00 to $60,000.00. Someone also wrote the number "6" over the number "5" in the body of the joint check agreement. These material alterations were noticed on the joint check agreement by BR Winwater's president, who testified the alterations were present when he received and signed the joint check agreement on March 14, 2014. However, because the joint check agreement was not in effect at the time Woodrow Wilson issued its last payment to Amtek prior to terminating Amtek's subcontract, we pretermit any discussion regarding the validity of the joint check agreement and any material alterations thereto.